**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**STANLEY KRUPICKI,**                                       **PLAINTIFF**
**INDIVIDUALLY AND ON BEHALF**
**OF OTHERS SIMILARLY SITUATED**

**V.**                      **NO. 4:12-CV-150 (KGB)**

**EAGLE ONE, INC.,**
***a/k/a* EAGLEONE LOGISTICS,**
***a/k/a* PRINT N' MAIL**                                 **DEFENDANT**

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, EagleOne, Inc., a/k/a EagleOne Logistics, a/k/a Print N' Mail ("EagleOne"), by and through its attorneys, Cross, Gunter, Witherspoon & Galchus, P.C., and for its Brief in Support of Motion for Summary Judgment on all of the claims set forth in the Complaint filed by Plaintiff, Stanley Earl Krupicki ("Krupicki"), states:

## TABLE OF CONTENTS

I.  <u>INTRODUCTION</u> .................................................................................. 2

II.  <u>FACTS</u> ............................................................................................... 4

III.  <u>STANDARD OF REVIEW</u> ................................................................. 15

IV.  <u>ARGUMENT</u> ..................................................................................... 18

      A. <u>Krupicki is not eligible for overtime compensation under the FLSA</u> .......... 18

           1. **Krupicki was not an employee as defined by the FLSA** ........... 19

               a. *EagleOne's Degree of Control* ............................................. 20

               b. *Extent of Investments by Krupicki* ...................................... 25

               c. *Krupicki's Risk of Profits and Losses* .................................. 27

               d. *Skill and Initiative of Owner-Operators* ................................ 30

197835

e.  *Permanency of Relationship* ...............................................32

f.  *Owner-Operators Not Integral to EagleOne's Motor Carrier Business* ...........................................................................33

g.  *Other Factors* .....................................................................35

    i.  Tax Deductions Indicative of Independent Contractor Status .........................................................................35

    ii. Similar Lease Arrantments Held Lawful ....................36

h.  *Summary*.............................................................................36

2.  **Even if he was an employee, Krupicki was exempt from overtime compensation under the FLSA**...................................37

3.  **Even if Krupicki was entitled to overtime compensation, he has failed to show that he is entitled to any unpaid overtime for work performed** ..........................................................................40

B.  EagleOne Did Not Retaliate Against Krupicki............................................41

C.  The Arkansas Deceptive Trade Practices Act Is Inapplicable to Krupicki's claims and, even if it was, Krupicki has failed to eastablish any question fo fact as to whether EagleOne is liable under its provisions...............................................................................................46

D.  Krupicki Cannot Establish An Unjust Enrichment Claim Against EagleOne ..............................................................................................51

V.  CONCLUSION ..................................................................................................52

## I.      **INTRODUCTION**

Krupicki entered an Independent Contractor Agreement with EagleOne, a non-asset based third-party interstate logistics company and licensed motor carrier, to furnish the equipment and labor necessary to complete deliveries arranged by EagleOne.    Pursuant to the contract, Krupicki agreed that his failure to fulfill the expectations and requirements of EagleOne's customers constituted a breach of the contract that could result in the termination of the contract.

To complete the delivery opportunities he accepted pursuant to the terms of the contract, Krupicki furnished multiple motor vehicles and the services of several drivers he retained to operate the motor vehicles.  Krupicki procured one of the vehicles he furnished and personally operated from a third-party equipment vendor.  Prior to automatically depositing Krupicki's settlement into Krupicki's business checking account, a third-party financial services provider and settlement processing agent deducted, as authorized by Krupicki, payments for the vehicle lease from the compensation Krupicki received in exchange for furnishing equipment and driving services.  When Krupicki consistently failed to fulfill the expectations and requirements of EagleOne's customers, Krupicki's Independent Contractor Agreement was terminated.

Krupicki filed this lawsuit on March 7, 2012, alleging that EagleOne unlawfully: (1) denied Krupicki overtime compensation under the Fair Labor Standards Act ("FLSA"); (2) retaliated against Krupicki when it terminated his Independent Contractor Agreement; and (3) deducted excessive amounts for the vehicle lease under the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. §§ 4-88-101, *et seq.*  Krupicki further alleges EagleOne was unjustly enriched as a result of its unlawful actions.

As set forth below, the undisputed facts demonstrate Krupicki was an independent contractor and not an employee.  Thus, the FLSA does not apply to Krupicki.  On this basis alone, Krupicki's claims for unpaid overtime and unlawful retaliation under the FLSA fail as a matter of law.

197835

Even if EagleOne had in fact employed Krupicki, the undisputed facts further establish Krupicki was not entitled to overtime under the FLSA as a matter of law because (1) Krupicki was a driver in interstate commerce and Section 13(b)(1) of the FLSA (the "Motor Carrier Exemption") therefore excluded Krupicki from the FLSA overtime requirements and (2) Krupicki has failed to allege, among other things, what hourly wage he was paid, estimate how many hours he worked for which he was not compensated, or allege that EagleOne had knowledge of any purported overtime he worked.  Regardless of whether the FLSA applied, Krupicki has not and cannot set forth facts giving rise to a claim for unlawful retaliation because Krupicki did not engage in any statutorily protected activity prior to the termination of his contract.

Krupicki's claims under the ADTPA fail because he has failed to establish any evidence that EagleOne utilized unfair or deceptive trade practices by deducting the payments for the vehicle lease from Krupicki's settlement checks.  And Krupicki's claim for unjust enrichment fails because Arkansas law does not recognize claims for unjust enrichment when an express contract governs the parties' relationship.  Because a written contract governed the relationship between Krupicki and EagleOne, Krupicki's claim for unjust enrichment fails as a matter of law.

## II.   FACTS

EagleOne, a licensed motor carrier operating under the authority of the Federal Motor Carrier Safety Administration (the "FMCSA") of the United States Department of Transportation (the "DOT"), provides non-asset based third-party interstate logistics services, focused on arranging the expedited transportation and delivery of products for its customers in several states, including Arkansas.  Affidavit of Scott Maddox, ¶¶ 3-4,

197835

attached to Defendant's Motion for Summary Judgment ("Defendant's MSJ") as Exhibit A ("Maddox Aff."). EagleOne's customers include, among others, pharmacies, financial institutions, and retailers of office supplies and auto-parts. *Id.* at ¶ 5.

EagleOne's services in Arkansas combine its expertise in logistics with the operation of both dedicated and non-dedicated cross-docks to receive and prepare customer products for delivery. Maddox Aff., ¶ 6. These products include, among other things, medical and pharmaceutical specimens and supplies (including controlled substances regulated by the Federal Drug Enforcement Agency (the "DEA"))[1] and retail materials, including office supplies and automobile parts. *Id.* at ¶ 4. EagleOne arranges for the movement of its customers' products on the final stage of their shipment from the retailer or wholesaler to individual consumers. *Id.* at ¶ 7.

The customer products originated from several locations throughout the United States (including, among others, Texas and Louisiana). *Id.* at ¶ 8. The customer products are transported from retailers or wholesalers to cross-docks located throughout the United States, including cross-docks located in Little Rock, Fort Smith, and Springdale, Arkansas. Maddox Aff., ¶¶ 9-10. At this point, many of the customer products have already been purchased and are designated for delivery to specific consumers. *Id.* As such, the customer products are not processed or altered in any way upon arrival at the cross-docks. *Id.* at ¶ 10. Instead, the customer products are generally staged, sorted by distribution route, and loaded for transportation and delivery to the purchasers within hours of arrival. *Id.* at ¶ 11.

---

[1] Notably, the DEA requires that the persons delivering controlled substances, including independent contractors, meet certain standards under federal law. *See, e.g.*, 21 C.F.R. § 1301.90.

197835

In Arkansas, the majority of the deliveries that EagleOne arranges involve what is sometimes referred to as distribution or routed work. *Id.* at ¶ 12. Customers that request routed work require daily pick-up and deliveries from and to a number of locations in a given area in Arkansas, including the cross-docks. *Id.* at ¶ 13. EagleOne ensures the fulfillment of various requirements that its customers impose depending on the type of products to be delivered and the urgency of the deliveries. Maddox Aff. at ¶ 14.

Because the volume of the deliveries it facilitates fluctuates often, EagleOne, like many other carriers in the courier industry, engages owner-operators that provide the equipment[2] and drivers necessary to complete the transportation and delivery services under the terms of a standard, written Independent Contractor Agreement (the "IC Agreement"). Maddox Aff., ¶ 15; *see also Id.* at ¶ 16, Ex. 1. Some owner-operators furnish multiple vehicles, sometimes operate one vehicle themselves, and retain (as employees or independent contractors) qualified additional drivers (referred to as "sub-agents") to complete the deliveries EagleOne arranges. *Id.* at ¶ 19.

Pursuant to the IC Agreement, owner-operators agree to meet the expectations and requirements of EagleOne customers. *See* IC Agreement, at ¶¶ 1, 3, attached to Defendant's Motion for Summary Judgment as Exhibit B. Among other things, customers require, and owner-operators agree to ensure, that deliveries are completed at express times pursuant to specific standards regardless of whether an owner-operator or sub-agent completes the delivery. IC Agreement, ¶ 3. Some of these standards relate to safety concerns. Maddox Aff., ¶¶ 9, 21-23. For example, because

---

[2] EagleOne does not provide to or reimburse for any equipment utilized by drivers who contract with EagleOne. Maddox Aff., ¶ 18.

drivers who contract with EagleOne and their sub-agents enter secure business facilities while making deliveries, some of EagleOne's customers require owner-operators and sub-agents to wear uniform clothing and carry an identification badge. *Id.* at ¶ 4; Maddox Aff., ¶ 21.  Owner-operators elect whether to purchase these items from EagleOne or another source.  IC Agreement, ¶ 5(c).

Other customer requirements relate to the delivery equipment itself.   *See* Maddox Aff., ¶ 17.  For example, one of EagleOne's primary customers, Office Depot, at one time required 16- or 24-foot straight trucks to be utilized for some distribution routed work.   *Id.* at ¶ 24.  As such, only owner-operators that furnished delivery equipment meeting those standards could accept delivery opportunities for that Office Depot distribution work.  *Id.* at ¶ 25.  Owner-operators were free to procure delivery equipment meeting Office Depot's requirements from any third party.  *Id.* at ¶ 26.

EagleOne referred owner-operators to Bush Leasing, Inc. ("Bush Leasing"), a third-party equipment vendor, to procure a truck meeting the Office Depot requirements, but owner-operators were free to procure equipment meeting the Office Depot requirements from elsewhere.   *Id.* at ¶ 27.   Pursuant to a Program Agreement EagleOne entered into with Bush Leasing in 2006, EagleOne agreed to deduct the payments owner-operators owed to Bush Leasing for truck rental or financing from the compensation EagleOne paid those owner-operators in exchange for the delivery equipment and driving services those owner-operators furnished. *See* Maddox Aff., ¶¶ 27-28, 32; *see also* Program Agreement, ¶¶ 1, 3, attached to Maddox Aff. as Exhibit 2.[3]  Bush Leasing and EagleOne were separate legal entities and no joint venture or

---

[3] Under the Program Agreement, Bush Leasing provided a statement each month to EagleOne, or its settlement processing agent, listing the amount owed by each participating owner-operator.  *See*

agency relationship existed between the two.  *See* Program Agreement, ¶ 6; *see also* Maddox Aff., ¶ 34.

### Krupicki Contracted with EagleOne as an Owner-Operator

In 2006, Krupicki completed a DOT mandated Driver Application and signed a standard IC Agreement with EagleOne.   Krupicki Dep., p. 24:13-14; Krupicki IC Agreement, attached to Affidavit of Scott Maddox as Exhibit 1; DOT Agreements, attached to Defendant's MSJ as Exhibit H.  Pursuant to the IC Agreement and in fact, Krupicki understood that he would be an independent contractor, not an employee. Krupicki Dep., p. 24: 21-23; *see* IC Agreement, ¶ 10.

Krupicki likewise entered an agreement with IC Solutions, Inc. ("ICS"), a third-party financial services provider and settlement processing agent.  Maddox Aff., ¶ 35; *see* ICS Agreement, attached to Defendant's MSJ as Exhibit C.    EagleOne does not own, and has not ever owned, ICS. *See* IC Solutions, Inc. Secretary of State Filing, attached to Defendant's Motion for Summary Judgment as Exhibit T.  ICS offered owner-operators like Krupicki various insurance coverages, tax services, discounts, and other items through third-party vendor programs sponsored and/or facilitated by ICS. ICS Agreement, ¶¶ 3, 4, 10; *see also* ICS Tax Escrow Authorization, attached to Defendant's MSJ as Exhibit G.  Pursuant to the ICS Agreement, Krupicki authorized ICS to calculate the amount of his weekly settlement check by deducting from the compensation Krupicki received in exchange for the equipment and driving services he furnished to EagleOne any amounts owed for insurance, services, and/or equipment

---

Program Agreement, attached to Maddox Aff. as Exhibit 2.  In the event of default by an owner-operator, EagleOne agreed to return the truck to Bush Leasing without further obligation in the event EagleOne could not find an owner-operator interested in assuming the lease.  *See* Program Agreement, ¶¶ 3, 4; *see, e.g.*, Assignment of Lease Agreement, attached to Maddox Aff. as Exhibit 3.

8

leased or purchased from or through ICS or EagleOne.  ICS Agreement, ¶¶ 2, 5; *see* Maddox Aff., ¶ 31.

Krupicki authorized ICS to deposit his net settlement into the banking account Krupicki established for his business, Picki Logistics.[4]  Krupicki Dep., pp. 31:25-32:19; *see* Picki Logistics Direct Deposit Authorization, attached to Defendant's MSJ as Exhibit I.  Krupicki, as a sole proprietor, also filed an Affidavit for Certificate of Non-Coverage with the Arkansas Workers' Compensation Commission to be excluded from the mandatory insurance requirements under Arkansas laws.  *See* Affidavit of Non-Coverage, attached to Defendant's MSJ as Exhibit J.

### Krupicki Equipment

As an owner-operator, Krupicki agreed to furnish the equipment and labor necessary to pick-up, transport, and deliver packages.  Krupicki Dep., p. 25:3-5; IC Agreement, ¶¶ 2, 3, 4, 5(c).  The equipment Krupicki furnished under the IC Agreement initially included an over-cab truck Krupicki rented from Ryder for $425.00 per week in rental fees.  Krupicki Dep., p. 25:12-22.  Krupicki later purchased and furnished a 2003 Chevrolet Express van to complete some of the delivery opportunities he accepted under the IC Agreement.  Krupicki Dep., p. 42:1-4.

Krupicki also (for the first time) financed a vehicle when he leased a 2007 Isuzu NPR box truck through Bush Leasing in June of 2007 (the "Bush Truck").  Krupicki Dep., pp. 22:21-23, 25:23-27:6; *see* Bush Lease Agreement, attached to Defendant's MSJ as Exhibit E.  With the Bush Truck, Krupicki was able to accept delivery opportunities related to the Office Depot distribution work requiring a 16- to 24-foot straight truck.

---

[4] Krupicki later incorporated his business and it is now known as Picki Logistics, Inc.  Krupicki Dep., p.31:8-24; see Secretary of State Filing, Exhibit O.

197835

Maddox Aff., ¶¶ 24-25.[5]   Krupicki paid for insurance, maintenance and repair fees for the Bush Truck, fuel, and the truck's registration fees himself.  Krupicki Dep., pp. 28:22-29:12; IC Agreement, at ¶ 5(c); *see* Maddox Aff., ¶ 20.   Krupicki also registered the Bush Truck in his own name.   *See* IC Agreement, ¶ 5(c); *see also* Bush Truck Registration Forms, Exhibit K.   In line with the Bush Leasing and ICS Agreements, Krupicki's lease payments were deducted from his weekly settlement checks.  Krupicki Dep., p. 26:16-23; p. 27:15-18; Bush Lease Agreement, ¶ 2; ICS Agreement, ¶ 10.

Krupicki also agreed to supply a hand-held scanning device for purposes of tracking packages delivered to EagleOne's customers.  *See* Krupicki Dep., p. 30:2-7; IC Agreement, ¶ 5(a).   Nothing prevented Krupicki from securing a device with the functionality necessary to interface with EagleOne's operating system from a third party (Maddox Aff., ¶ 37), but Krupicki elected to lease a Palm Pilot scanner from EagleOne at a flat weekly rate of $7.00.  *See* Palm Pilot Agreement, attached to Defendant's MSJ as Exhibit F.   Krupicki also supplied other delivery equipment and supplies that he purchased himself from other sources.  Krupicki Dep., pp. 30:21-31:7.  Krupicki further obtained and maintained insurance fulfilling limits established by EagleOne customers. IC Agreement, at ¶¶ 8, 9, 17; Maddox Aff., ¶ 20.

### Krupicki's Sub-Agents

Krupicki retained sub-agents to operate Krupicki's vehicles and complete delivery opportunities accepted by Krupicki.[6]   Krupicki Dep., pp. 42:19-43:4, 44:18-45:10.

---

[5] The Bush Truck has a gross operating weight of approximately 15,000 pounds.  *See* Bush Truck Registration Forms, Exhibit K.

[6] Krupicki initially referred to his independent contractors as employees, but he later testified that they were in fact independent contractors to whom he issued Form 1099s. *Compare* Krupicki Dep., p. 33:15-19 *with* Krupicki Dep., pp. 44:11-45:17.  At any given time, Krupicki retained up to two sub-agents and

Pursuant to the IC Agreement, Krupicki agreed to set the schedule, establish working conditions, pay all federal and state taxes, establish the rate of pay, and purchase all necessary insurance for himself and his sub-agents.  Maddox Aff., ¶¶ 20, 22.

Through the course of his contracting with EagleOne, Krupicki selected and assigned distribution routes to at least nine sub-agents.  *See* Krupicki Dep., pp. 33:23-35:1.  Krupicki selected his sub-agents and ensured his sub-agents underwent the same background checks, driving record checks, and drug tests Krupicki himself was required to undergo for purposes of fulfilling the expectations and requirements of EagleOne customers and the federal government under the terms of the IC Agreement. Krupicki Dep., p. 44:13-17; IC Agreement, ¶¶ 3, 6; Maddox Aff., ¶¶ 20, 22.  To that end, Krupicki terminated one of his sub-agents when he learned that the sub-agent failed a drug screen and was no longer eligible to complete deliveries for EagleOne customers. *See* Krupicki Dep., pp. 35:22-37:6; IC Agreement, ¶¶ 3, 6.[7]

### Krupicki's Distribution Routes

When EagleOne offers an owner-operator a distribution route, the owner-operator is provided with information related to the amount the distribution route pays per piece and the usual number and location of stops on the distribution route, which may vary from day to day.  *See* Maddox Aff., ¶ 38.  Pursuant to the IC Agreement, owner-operators may reject any delivery opportunity offered for any reason or no reason at all.  IC Agreement, ¶ 10.

---

also received uncompensated assistance from his father in making deliveries.  *See* Krupicki Dep., p. 35:10-12.

[7] One of Krupicki's other sub-agents, Chad Launius, left Krupicki to enter into an IC Agreement to furnish equipment and driving services as an owner-operator.  *See* Krupicki Dep., pp. 39:24-40:5.

197835

Krupicki agreed to furnish the equipment and driving services to complete routed distribution deliveries in multiple territories, including Downtown Little Rock, Conway, North Little Rock, and, for a short time, West Little Rock.  *See* Krupicki Dep., pp. 40:14-17, 43:5-11, 43:15-25.  Krupicki was not paid a salary or by the hour, but instead Picki Logistics received a direct deposit payment "per piece" or "per route" from EagleOne calculated and offered based on the revenue generated by the amounts customers agree to pay for logistics and transportation and delivery distribution services.  *See* IC Agreement, ¶ 3; *see also* Maddox Aff., ¶ 39; *see, e.g.,* Krupicki, Dep., p. 42:5-14; ICS Direct Deposit Authorization, Exhibit I.  In general, the routed distribution delivery opportunities Krupicki accepted paid $1.65 per piece delivered and the amount of pieces delivered varied for each distribution route from day-to-day.  Krupicki Dep., pp. 40:21-41:5, p. 43:5-11, p. 43:15-25.

### Krupicki's Compensation of Himself and His Sub-Agents

Because he only received payment for completed deliveries, Krupicki agreed to submit a manifest, and/or make an electronic record on the scanning device as evidence of the deliveries he and/or his sub-agents completed.  IC Agreement, ¶¶ 3, 19; *see* Maddox Aff., ¶ 40.  The compensation Krupicki received in exchange for the equipment and labor he provided, including the driving services of Krupicki's sub-agents, was reported on an IRS Form 1099.  Krupicki Dep., p. 32:22.  EagleOne did not withhold state and federal taxes from these amounts.  IC Agreement, ¶ 12.  Krupicki, after taking into consideration his expenses, decided to pay his sub-agents $0.85 per piece delivered, and Krupicki paid these amounts from the Picki Logistics corporate

bank account. *See* Krupicki Dep., pp. 32:25-33:11; p. 33:15-19; pp. 33:23-34:35:1; pp. 44:18-45:10.

After paying his sub-agents and other expenses, Krupicki paid himself "what was leftover" from his business account. Krupicki Dep., p. 33:3-19. Krupicki's annual income generated through his contract with EagleOne, after all deductions and fees were subtracted, varied over the years, ranging from $50,000 in 2009 to $132,000 in 2006. Krupicki Dep., pp. 54:10-19.

Krupicki determined the best manner in which to make each day's deliveries. Krupicki Dep., pp. 56:2-57:4; *see also* IC Agreement, ¶ 10. EagleOne provided Krupicki with a list of each delivery destination on his accepted distribution routes and Krupicki would then look at map and use "common sense." Krupicki Dep., p. 56:5-12. Krupicki would "determine the best course of action" and by using "logic." Krupicki Dep., p. 57:5-10. EagleOne merely informed Krupicki as to "which deliveries to make first and last and then [Krupicki] picked how to get there in between." Krupicki Dep., p. 57:18-20 (alteration supplied). The obvious goal, in order to maximize profits per distribution route, would be to "take as little time as possible." Krupicki Dep., p. 57:21-23.

Even while Krupicki furnishing equipment and driving services to EagleOne under the IC Agreement, Krupicki contracted with other companies to furnish delivery equipment and driving services on Saturdays, and Krupicki received separate IRS Forms 1099s from those companies. Krupicki Dep., p. 55:7-20.

### Krupicki's IC Agreement Termination

During the week of Thanksgiving in 2011, Krupicki only made deliveries for three of the five workweek days due to the holidays. Krupicki Dep., p. 76:7-14. Due to the

197835

low volume of products delivered that week, Krupicki's settlement check from ICS was only $60.00.  Krupicki Dep., p. 76:12-15; p. 77:14-22.  Krupicki believed his settlement check contained an error, so he complained about the payment to Brad Schultz, the North Little Rock Terminal Manager.  Krupicki Dep., p. 76:13-20; p. 78:2-12.  According to Krupicki, Schultz told him that he would look into the matter and follow-up with Krupicki.  Krupicki Dep., p. 76:15-20.  The next day, Schultz informed Krupicki that there were in fact delivery pieces that were not included in his settlement check, and that Krupicki would be fully paid for those deliveries.  Krupicki Dep., pp. 76:24-77:3; p. 78:2-12.

On December 12, 2011, Krupicki's contract with EagleOne was terminated.  *See* Termination Notice, attached to Defendant's MSJ as Exhibit L.  After his IC Agreement with EagleOne was terminated, Krupicki did not apply for unemployment benefits with the State of Arkansas.  Krupicki Dep., pp. 78:24-79:1.

### Krupicki's Business Operations Post-EagleOne

After his IC Agreement was terminated, Krupicki opted to purchase the Bush Truck in cash for its then-fair market value pursuant to the buyout provision in his Bush Lease Agreement.  Krupicki Dep., p. 74:7-24; Bush Lease Agreement, ¶ 4(b), Exhibit E.[8]  Krupicki continues to utilize the Bush Truck and his 2003 Chevrolet Express van in his ongoing delivery business operations today.  Krupicki Dep., p. 16:3-20.  Krupicki likewise retains at least one of his former sub-agents from EagleOne in his independent delivery services.  Krupicki Dep., pp. 84:23-85:5; p. 86:2-13.

---

[8] The buyout provision allowed Krupicki the opportunity to purchase the Bush Truck and take title in his own name at any time.  *See* Bush Lease Agreement, ¶ 4, Exhibit E.

197835

Krupicki continues to furnish delivery equipment and labor necessary to complete deliveries as an owner-operator independent contractor.  Krupicki Dep., pp. 14:24-15:4, p. 16:3-5; pp. 20:25-21:2.  Krupicki finds freight shipment orders online through various websites.  Krupicki Dep., p. 15:8-12.  Krupicki also utilizes relationships with other delivery vendors in Central Arkansas, some of which are EagleOne's industry competitors, including Xpress Courier, Statewide Transport, and Owens & Minor.  Krupicki Dep., pp. 15:13-16:2.  Between his online freight orders and orders through EagleOne competitors, Krupicki delivers anything from chicken eggs to office products and medical supplies.  *See* Krupicki Dep., pp. 16:8-21:25.  Consistent with the revenue his business generated while Krupicki was under contract to EagleOne, Krupicki receives in exchange for furnishing equipment and driving services compensation at $1.65 per piece, $145 per day, or $800 per week depending on the type of deliveries he completes.  *See id.*  Those companies also contract with Krupicki as an independent contractor.  Krupicki Dep., pp. 20:25-21:2.

### III.    STANDARD OF REVIEW

Summary judgment may be granted if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c); *Andrews v. Fowler*, 98 F.3d 1069, 1074 (8th Cir. 1996).  "[T]he plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case," and as such a failing necessarily renders all other facts immaterial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Consequently, summary judgment

15

should be granted where no reasonable jury could find in favor of the non-movant on any one fact essential to its claim. *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (citations omitted); *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092, 1094 (8th Cir. 2007) (citing *Anderson*, 477 U.S. at 248).

Once a motion for summary judgment points out the absence of proof regarding an essential element of the non-movant's case, the burden shifts to the non-movant to offer probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993). The non-movant's evidence must raise more than "some metaphysical doubt" to withstand a motion for summary judgment. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Fed. R. Civ. P. 56 requires that a response, by affidavits or other evidence, specifically show that there is a genuinely disputed issue of material fact. *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993) (citing *Celotex*, 477 U.S. at 322).

A plaintiff may not create a material issue of fact solely based upon his own self-serving, unsubstantiated testimony contained in his affidavit or deposition. *O'Bryan v. KTIV Television,* 64 F.3d 1188, 1191 (8th Cir.1995) (approving grant of summary judgment if non-moving party's only evidence to rebut motion is conclusory, self-serving statements made in affidavit); *Davenport v. Riverview Gardens Sch. Dist.,* 30 F.3d 940, 945 (8th Cir.1994) (affirming summary judgment for defendant-employer on plaintiff's claim of racial discrimination where plaintiff's only evidence to support allegation that he was treated differently from other similarly situated persons was his own unsubstantiated statements in deposition). Nor may the non-movant in a summary

judgment motion rest upon the mere allegations of his or her pleadings. *Robinowitz v. Gibraltar Savings*, 23 F.3d 951, 954 (5th Cir. 1994). *Id.* It is well settled that conclusory evidence or statements, rather than factual statements, are insufficient to support a response to a motion for summary judgment. *Jackson*, 994 F.2d at 1304; *see also Rose-Maston v. NME Hosp., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998); *Luciano v. Monfort, Inc.*, 259 F.3d 906, 910 (8th Cir. 2001) (citation omitted); *Weger v. City of Ladue*, 500 F.3d 710, 728 (8th Cir. 2007).

Not only must the non-movant support each essential element of their claim with evidence, but evidence that does not support an essential element of the non-movant's claim is irrelevant to deciding a motion for summary judgment. *Hervey v. County of Koochiching*, 527 F.3d 711, 719 (8th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). Evidence that does not support the non-movant's claim but simply demonstrates the existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1028-1029 (8th Cir. 2006) (citing *Anderson*, 477 U.S. at 247-48).

Modern federal courts "should be somewhat more hospitable to summary judgments" than they were prior to *Celotex*, *Anderson*, and *Matsushita*. *City of Mount Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). *See e.g. Stever v. Independent School Dist. No. 625*, 943 F.2d 845, 854 (8th Cir. 1991) (citing *Mount Pleasant*, 838 F.2d at 273-74, and granting summary judgment on three claims arising out of alleged employer retaliation). "The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material

fact" and "need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint."  *Id.*; *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995) (citations omitted).

## IV.   ARGUMENT

Despite his allegations, the undisputed facts and evidence clearly indicate that Krupicki was not employed by EagleOne.  Even if he was, Krupicki was exempt from overtime compensation by law, and he has not established any facts showing that he did in fact work over 40 hours in any given week.  Further, Krupicki agreed, in writing, to each and every deduction from his weekly settlement check whether those deductions were imposed by EagleOne or another entity.  Based on the undisputed facts in this case, there are no remaining genuine issues of material fact, and EagleOne is entitled to summary judgment on all of Krupicki's claims.

### A.   Krupicki is not eligible for any overtime compensation under the FLSA.

Well-settled case law, in addition to language from the statute itself, makes clear that the FLSA does not regulate or apply to independent contractors.  *See Lester v. Wildwood Fin. Grp., Ltd.*, 205 F.3d 1346 (8th Cir. 2000).  Instead, the FLSA only applies to an "employee," which is defined in the Act as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  Further, the FLSA imposes an overtime exemption for any employee "[to] whom the Secretary of Transportation has power to establish qualifications[.]"  *Guyton v. Schwan Food Co.*, 2004 U.S. Dist. LEXIS 4174, at *7 (D. Minn. March 16, 2004) (citing 29 U.S.C. § 213(b)(1)), *aff'd at* 125 Fed. Appx. 84 (8th Cir. 2005).  Those qualifications include the "maximum hours of service of employees, and safety of operation and equipment."  49 U.S.C. § 304(a)(1)(2).  Thus, Krupicki's FLSA

197835

claims fail as a matter of law because of his independent contractor status and, even if he is an employee, he is still not entitled to any overtime compensation under the FLSA.

### 1. Krupicki was not an employee as defined by the FLSA.

As stated, the FLSA does not apply to independent contractors.[9]  Courts use the "economic reality" test to determine whether an individual is an employee or an independent contractor under the FLSA.  *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 81 (1961).  Under this test, courts consider the "totality of the circumstances." *Gilzow v. Lender's Title Co.*, 2006 U.S. Dist. LEXIS 11733, at *11 (W.D. Ark. March 3, 2006).

Generally, courts examine the following six factors to distinguish employees from independent contractors under the FLSA: (1) the degree of control exercised by the alleged employer; (2) the worker's investment in the business; (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative in performing the job; (5) the permanency of the relationship; and (6) the extent to which the work is an integral part of the alleged employer's business. *See Gilzow*, 2006 U.S. Dist. LEXIS 11733, at *11-*12 (internal cites omitted); *see also Express Sixty-Minutes*, 161 F.3d at 303; *McComb v. McKay*, 164 F.2d 40, 49 (8th Cir. 1947).  Essentially, "the focus is on whether the individual is 'economically dependent on the business to which he renders service' or is, 'as a matter of economic fact, in business for himself.'"  *Gilzow*, 2006 U.S. Dist. LEXIS 11733, at *12 (citing *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567 (10th Cir. 1994)).  No one factor is dispositive, "nor is the list complete." *United States v. Silk*, 67 S.Ct. 1463, 1469 (1947).

_____

[9] Plaintiff bears the burden of proving that he was an employee under the FLSA.

At the outset, it is noteworthy that Krupicki's IC Agreement expressly provided that his role is that of an independent contractor/owner-operator and not as an employee.  *See* Krupicki's IC Agreement, attached to Defendant's MSJ as Exhibit R. Courts hold that contract language in an independent contractor agreement, although not solely determinative of employment status, is properly considered by courts as one "circumstance of the whole activity."  *Lester*, 204 F.3d at 1346 (citing *McComb*, 164 F.2d at 48-49); *see also Birchem v. Knights of Columbus*, 116 F.3d 310, 313 (8th Cir. 1997).  Further, Krupicki himself considered his status to be an independent contractor with EagleOne.  Krupicki Dep., p. 24:21-23.

With the language from Krupicki's IC Agreement and his understanding of his relationship with EagleOne, in addition to the facts of his relationship with EagleOne in light of the following analysis, little doubt will remain that Krupicki was anything but an independent contractor.

   *a.  EagleOne's Degree of Control*

In *Herman v. Express Sixty-Minutes*, potential drivers were required to attend an initial orientation session, provide their own vehicles, insurance, equipment and maintenance for the same. 161 F.3d at 301-02. Those drivers were also required to use the company's radios and make themselves available 24-hour on-call deliveries, but they were free to accept or reject any delivery calls without retaliation and utilized their own judgment in making the deliveries.  *Id.*

   The *Express Sixty-Minutes* court found the courier company alleged to have employed owner-operators similar to Krupicki had minimal control over the contracted drivers because, in part, the drivers set their own hours and days of work, the drivers

could reject deliveries without retaliation, and the drivers could work for other courier delivery companies if they chose to do so.  161 F.3d at 303.  That court found these circumstances supported a finding of independent contractor status despite the fact that those courier drivers attended an orientation and were required to be on-call twenty-four hours per day.  *Id.*  Thus, the court concluded that the courier company had minimal control over those contracted courier drivers.  *Id.*

Further, courts have consistently held that third-parties, such as customers, impose requirements on delivery times and security protocols, and such facts do not evidence an employer-employee relationship.  *See, e.g., Luxama v. Ironbound Express, Inc.*, No. 11-2224, 2012 U.S. Dist. LEXIS 9929, at *10-12 (D. N.J. Jun. 28, 2012) (finding evidence that "drivers are told where to report to work, what they will be paid and where to pick up and deliver" products unavailing and deeming same drivers to be independent contractors under the FLSA because "the fact that a person is required to be at a given place at a given time or assigned work [is not] sufficient to support an employee-employer relationship"); *Stull v. Noble Logistics Servs.*, No. C064308 (Cal. App. Jun. 8, 2011) (analyzing whether alleged employer exercised control over an owner-operator who provided equipment and personnel necessary to complete transportation and delivery services to medical facilities and confirming independent contractor status of owner-operator despite the fact that the alleged employer provided the owner-operator with delivery window times within which to complete deliveries)[10]; *Scantland v. Jeffrey Knight, Inc.*, 2012 U.S. Dist. LEXIS 43407, at *38-*46 (M.D. Fl. March 29, 2012) (finding that Uniform, ID badge, and background check requirements

---

[10] A copy of this unpublished opinion is attached to Defendant's Motion for Summary Judgment as Exhibit M.

197835

"does not affect the economic reality" of an independent contractor status because they are required to allow customers to understand the individual is authorized to do the work orders).  Courts have found that "when an alleged employer's control over an aspect of performance is motivated by a concern for customer service, that control does not suggest an employment relationship because it is "addressed to the ends to be achieved . . . rather than the means to achieve that result."  *C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855, 859 (D.C. Cir. 1995).

At least one court has held that no employment relationship existed between a delivery company and an independent contractor delivery driver where the alleged employee argued that evidence indicating he was required to wear a uniform weighed in favor of finding an employment relationship.  *FedEx Home Delivery v N.L.R.B.*, 563 F.3d 492, 497 (D.C. Cir. 2009).  The *FedEx Home Delivery* court looked to IRS Guidelines, which express that "a uniform requirement often at least in part is intended to ensure customer security rather than to control the driver."  *Id.* (citation omitted).  As the requirement to wear a uniform in that case was imposed by customers' demands for security, and not from the demands of the delivery company, the court found the uniform requirement did not weigh in favor of employment status.  *Id.*

Here, Krupicki's claims resemble those by other alleged employees in cases where courts found an independent contractor status under the FLSA.

As stated, Krupicki was free to operate his delivery routes however he chose within the windows of time established by EagleOne's customers.  *See* IC Agreement

Exhibit B, ¶¶ 10, 11.[11]   No established meal times, reports, or other supervisory requirements were imposed by EagleOne, and Krupicki operated his deliveries as he alone determined the "best route" based on his own logic.   Krupicki Dep., p. 57:5-10; *see id*.   EagleOne did not establish how Krupicki traveled between each route distribution destination; rather Krupicki himself determined how and when to travel between destinations.   In fact, Krupicki's operations were limited only by EagleOne's customers' requirements.  *See* IC Agreement, ¶¶ 3, 10.

Krupicki was also free to accept or reject, without retaliation, any distribution routes available for EagleOne's customers without retaliation of any kind.   *See* IC Agreement, ¶ 10; Affidavit of Scott Maddox, ¶ 41.[12]   Thus, he was the master of his own schedule and his sub-agents' schedules alike, and EagleOne had no oversight of his delivery operations.

Krupicki also had the freedom to engage other individuals to operate his delivery vehicles on his behalf, which he in fact did, and assign their work at his own discretion. Krupicki's sub-agents were subjected to the same background check and drug testing requirements that he was obligated to satisfy.   However, those safety requirements, too, were required by EagleOne's customer specifications and not by EagleOne.  *See* IC Agreement, ¶¶ 3, 6; *see also C.C. Eastern, Inc.*, 60 F.3d at 859.   In fact, the DOT imposed several of the regulations required for all commercial delivery drivers, including

---

[11] Krupicki's statement that his distribution routes and tasks were under "complete control" of EagleOne, *see* Document 26, § 3.1(a), is an unsupported, conclusory allegation that the Court should disregard.  *See Smith v. International Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008).

[12] On this point, Plaintiff again makes a conclusory allegation that EagleOne, "on occasion," required Plaintiff to deliver to Office Max facilities over his objections.   Plaintiff has failed to submit credible and admissible evidence to support this allegation.   The undisputed evidence demonstrates Plaintiff was in fact able to accept or reject distribution distribution routes.

Krupicki and his sub-agents.  *See* Krupicki DOT Forms, attached to Defendant's Motion for Summary Judgment as Exhibit H.

Krupicki points to the fact that one of his sub-agents, Jason Steele, was no longer allowed to operate delivery services to EagleOne's customers.  *See* Krupicki Dep., pp. 35:22-37:4.  However, Mr. Steele failed a drug test which made him ineligible to make deliveries per EagleOne's customer requirements.  *Id.* at p. 36:16-18; *see* IC Agreement, ¶¶ 3, 6, 24.  Notably, Krupicki could have retained Steele to provide driving services for the other companies Krupicki serviced.  Additionally, to the extent that Krupicki points to the fact that he and his sub-agents were required to wear uniforms or identification badges, this too was a customer requirement.  *See* IC Agreement, ¶¶ 3, 6; *see e.g.* McKesson Corporation Delivery Driver Expectations, attached to Defendant's Motion for Summary Judgment as Exhibit N.

In addition, Krupicki was not limited to making deliveries exclusively for EagleOne.  Krupicki's contract did not require that he deliver products exclusively for EagleOne's customers.  *See* IC Agreement, ¶ 10.[13]  As Krupicki testified, he did in fact make deliveries on Saturdays for other companies.  Krupicki Dep., p. 55:7-12.  This same freedom to contract was afforded to Krupicki's sub-agents as well.  Thus, the fact that Krupicki delivered enough daily distribution routes on behalf of EagleOne to keep him busy on a weekly basis is not supportive an employee relationship; instead, it

---

[13] Paragraph 16 of Krupicki's IC Agreement contains a restrictive covenant that was intended to inhibit the unfair competition and economic harm that could result from owner-operators' use of EagleOne's proprietary information obtained during the contractual time period.  That language was not intended to inhibit owner-operators from accepting their own work, with competing companies, during the contract period with EagleOne.  Indeed, as stated, the IC Agreement itself expressly evidences such a conclusion.  *See* IC Agreement, ¶ 10.  In reality, Krupicki began operating delivery routes for competing customers immediately after his contact with EagleOne was terminated and he is still doing so today.  *See* Krupicki Dep., pp. 14:24-15:4.  Thus, the economic reality is that he was not and is not limited by any restrictive covenants.

shows only that Krupicki chose to increase his weekly revenue potential by taking on multiple routes and utilizing his own agents to operate his trucks on his behalf.  Indeed, Krupicki received $0.85 per delivery by one of his agents, a rate that he himself determined.  Krupicki Dep., p. 44:18-25.

The foregoing evidence makes clear that Krupicki was afforded great discretion in his delivery operations and business decisions.  Krupicki was free to obtain his vehicles and equipment from any third-party source so long as they met EagleOne's customer requirements.  Krupicki was able to, and did, determine the distribution routes and times that he and his agents delivered, and EagleOne had no control or supervision over those decisions.  So long as he was able to maintain his own contractual obligations with EagleOne's customers, Krupicki was free to deliver for other companies, simultaneously with EagleOne's deliveries, if he so chose to do.  Thus, the minimal degree of control over Krupicki, which was entirely set by EagleOne's customer's requirements or federal regulations, supports a finding that he was an independent contractor.

b.  *Extent of Investments by Krupicki*

Courts also consider the extent to which an individual has invested in their businesses.  Recently, multiple plaintiffs brought a FLSA misclassification collective action claim against the defendant, a delivery logistics company with whom those plaintiffs contracted to perform pick-up and delivery services.  *Browning v. CEVA Freight, LLC*, 2012 U.S. Dist. LEXIS 114002, at *2 (E.D.N.Y. Aug. 11, 2012).  There, those individual drivers operated vehicles they themselves owned and were contractually obligated to pay all of the maintenance, fuel, and other incidental costs

25

required to operate their vehicles. *Id.* at *3.    Those plaintiffs also provided their own miscellaneous tools and supplies. *Id.*

The *CEVA* court found that those plaintiffs "made substantial investments in their businesses" that "of course supports a finding of independent contractor status." *Id.* at *51 (citing *Nichols v. All Points Transport Corp. of Michigan, Inc.*, 364 F. Supp. 2d 621, 632-33 (E.D. Mich. 2005) (finding that shipping company's truck drivers were independent contractors, in part, because drivers were responsible for capital investments in trucks)); *see also Carrell v. Sunland Construction, Inc.*, 998 F.2d 330, 333-34 (5th Cir. 1993) (finding an independent contractor status for welders, in part, because the welders invested an average of $15,000 in their own trucks and welding equipment).   In *Nichols*, the court found that the individuals' investments in trucks, equipment, and taxes made by those delivery drivers supported independent contractor status, and that court notably distinguished such facts from cases where one hiring party provides any equipment to be used by the hired party.  364 F. Supp. 2d at 632-33.

Here, Krupicki already leased one vehicle prior to contracting with EagleOne, and he leased another commercial delivery truck during the time that he delivered to EagleOne's customers, as well as other delivery equipment.   Krupicki himself stated that the Bush Truck he leased and subsequently purchased cost him approximately $80,000, which is in itself a significant investment.  Krupicki Dep., p. 28:17-21.  Krupicki also paid for insurance, fuel, costs, registration fees and taxes necessary to operate his vehicles—both for himself as well as his sub-agents—in performing his contractual obligations.   Notably, Krupicki also used this equipment on his own behalf when operating deliveries for other companies on Saturdays, and Krupicki is using the same

equipment in his post-EagleOne contract business operations.  Krupicki Dep., p. 16:12-20.

Krupicki's cost of owning and operating his vehicles and equipment was substantial, as found by other courts on nearly identical grounds.  *See CEVA*, 2012 U.S. Dist. LEXIS 114002, at *51-*52; *Carrell*, 998 F.2d 333-34.  Further, Krupicki assumed the cost of fuel, maintenance, and equipment for his sub-agents, which expanded his investment into his own small business.  This "investment" factor is appropriately summarized by Krupicki's own testimony where he explains that he specifically purchased one of his vehicles in order to operate the North Little Rock distribution route.  Krupicki Dep., p. 42:1-6.  Based on the extensive investments by Krupicki, in furtherance of his own business operations, this factor further supports a finding that Krupicki's status was an independent contractor with EagleOne.

c.  *Krupicki's Risk of Profits and Losses*

Under this factor, "the Court must determine whether Plaintiffs faced a real opportunity for either a profit or loss in their operations, depending upon the amount of their investment and their skills in management." *Luxama,* 2012 U.S. Dist. LEXIS 99292, at *10 (citation omitted).  In *Luxama*, the court found this factor supported a finding of independent contractor status when the delivery drivers asserting FLSA claims were paid on a per trip basis and were "able to increase their profits by acquiring additional trucks and employing drivers to assist with hauling cargo". *Id*. at *14-*15.  In *Express Sixty-Minutes*, the court found this risk factor pointed toward independent contractor status largely due to the fact that the "drivers had the ability to choose how

much they wanted to work and the experienced drivers knew which jobs were most profitable." 161 F.3d at 304.

Similarly, Krupicki was able to set the amount of work he undertook on a daily and/or weekly basis by having the freedom to accept or reject any distribution route. IC Agreement, Exhibit B, ¶ 10; Affidavit of Scott Maddox, ¶ 41. Krupicki was able to and did hire (as independent contractors) up to two workers at a given time to make deliveries on Krupicki's behalf to the customer distribution routes that he chose to assign them to operate. IC Agreement, ¶¶ 10, 11; *see* Krupicki Dep., pp. 42:19-45:17. Once again, Krupicki himself stated that he purchased a delivery van for the sole purpose of taking on the North Little Rock distribution route offered through EagleOne, which evidences the exact realistic opportunity for increased profits available to Krupicki. Krupicki Dep., p. 42:1-4. Indeed, one of his former sub-agents appears to have competitively negotiated the Conway distribution route away from him to operate individually. *See* Krupicki Dep., pp. 39:24-40:5. That scenario further evidences the risk of profits and loss for owner-operators deciding to utilize sub-agents as independent contractors, such as Krupicki.

Krupicki's weekly revenue was determined by the number of products delivered. There was no salary or commission, and he was only paid for the actual pieces delivered—nothing more. Krupicki himself determined the distribution routes (i.e. potential revenue) to accept, which naturally involved increased costs (i.e. fuel, maintenance, sub-agent, etc...), thereby implementing an element of risk for either increased or decreased income, depending upon several factors, like every business decision. *See* IC Agreement, ¶¶ 10, 11. Also, Krupicki retained $0.85 per piece

delivered by his sub-agent(s) for himself which, after covering their costs, became part of Krupicki's personal income.  Krupicki Dep., p. 44:18-25.

As Krupicki explained in his deposition, there were times during the year, such as holidays, when EagleOne's customers ordered less products than during other times of the year.  *See* Krupicki Dep., p. 77:14-22.  This economic principle, true in nearly every industry, evidences how Krupicki, at times, also incurred losses in revenue much like other small business owners.  This is the exact opportunity that courts consider to be an indicator of being in business for oneself, rather than being dependent upon an employer for a consistent amount of compensation.  *See Express Sixty-Minutes,* 161 F.3d at 304.

Krupicki's annual revenues decreased steadily throughout his contracting period with EagleOne: starting at $132,000 in 2006 and downwards toward $50,000 in 2010. Krupicki Dep., p. 54:10-19.[14]   This fact alone further indicates Krupicki's inherent economic risk of profits in losses while operating as a sole proprietorship (with independent contractors).   In addition, Krupicki was responsible for the products he delivered and, if through his own neglect of reporting damaged goods upon receipt or poor management  of a product damaged while under his control, Krupicki was liable to EagleOne for the replacement cost of any damaged customer items.   *See* IC Agreement, ¶ 19. As evidenced by the economic reality of the relationship between

---

[14] Interestingly, Krupicki's business revenues mirror the national trend of other small business revenues for the same time period, likely due to the well-known economic recession that all small business owners likely struggled through.  In fact, measures of small-businesses' perceptions decreased 142% from 2007 to 2010 concerning their financial situation, revenue, cash flow, capital spending, number of jobs and ease of obtaining credit. *See* Wells Fargo/Gallup Small Business Index, August 2010; *see also* The National Bureau of Labor Statistics, "BLS Spotlight on the Recession of 2007–2009," *available at* http://www.bls.gov/spotlight/2012/recession/pdf/recession_bls_spotlight.pdf.

197835

Krupicki and EagleOne, the risk of both profits and losses factor, too, supports finding

that Krupicki was an independent contractor and not an employee under the FLSA.

d.  *Skill and Initiative of Owner-Operators*

A general "question under this factor is whether the worker's skills are more like

piecework than an enterprise that actually depended for success upon the initiative,

judgment or foresight of the typical independent contractor."  *Werner v. Bell Med. Family*

*Ctr, Inc.*, 2011 U.S. Dist. LEXIS 28493, at *18-*19 (M.D. Tenn. March 18, 2011) (citing

*Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).  Courts have found that,

in the transportation industry, specifically:

> It is undisputed that driving a truck containing large loads of
> cargo requires a significant degree of skill.  The job requires
> the skill of handling a large vehicle, detailed knowledge of
> the national roadways, and a high level of stamina to be able
> to make long trips without fatigue.

*CEVA*, 2012 U.S. Dist. LEXIS 114002, at *53 (citing *Bonnetts v. Arctic Exp., Inc.*, 7 F.

Supp. 2d 977, 981-82 (S.D. Ohio 1998); *Chrisner v. Complete Auto Transit, Inc.*, 645

F.2d 1251, 1262-63 (6th Cir. 1981)); *see also Nichols*, 364 F. Supp. 2d at 632. Further,

one court recently found that the tasks performed by delivery-drivers require "a

significant degree of skill" because the drivers "needed to have professional driving

skills, business management skills, knowledge of Department of Transportation

regulations, and freight-handling skills."  *CEVA*, 2012 U.S. Dist. LEXIS 114002, at *52-

*53.

Further, where an individual's ability to increase his or her own revenues

depends upon the amount of work the individual chooses to accept or reject, then there

is sufficient amount of initiative required for the position.  *See CEVA*, 2012 U.S. Dist.

LEXIS 114002, at *53-*54.  Such initiative is expanded where the individual is free to

197835

expand his or her business by hiring more workers to work on his or her behalf.  *Id.* Thus, an owner-operator who is capable of efficiently distributing delivery routes, coordinating sub-agents' work, and having the opportunity to expand one's operations through initiative is more akin to operating a business on one's own behalf.

Here, as discussed above, Krupicki was contractually free to accept as many or few routes as were available for delivering to EagleOne's customers.  Krupicki was not told how to make his deliveries.  *See* IC Agreement, ¶¶  10, 11.  Thus, by using his own knowledge of central Arkansas's roadways and local traffic patterns, Krupicki could save costs by limiting fuel and time in making deliveries on a daily, weekly, and yearly basis.

Also, as already noted, Krupicki took the initiative to hire up to two drivers to operate his vehicles and equipment in order to expand his potential revenues, and he purchased one vehicle for the specific purposes of expanding his business operations into North Little Rock.  *See* Krupicki Dep., pp. p. 42:1-43:4.  Krupicki assigned those drivers, of his own choosing, to the distribution routes he agreed to service under the terms of his contract with EagleOne.  Further, Krupicki and his agents operated his commercial vehicles, subject to DOT regulations, by carrying various types of cargo under his control for which he would be liable to EagleOne for any damaged goods. *See* DOT Forms, Exhibit H; *see also* IC Agreement, Exhibit B, ¶¶ 17, 19.  Thus, both his operational and management skills affected his net revenues.

Considering these facts, it is apparent that Krupicki had both operational skill in determining which routes were most efficient in operating his truck through the Little Rock metropolitan area; the initiative to take on additional distribution routes for increased profits; social skills in interacting with customers at each destination;

entrepreneurial skills in determining, as a risk of increased profits or potential losses *and* individual initiative, which distribution routes to accept or reject; managerial skills in finding and hiring his sub-agents, assigning their routes, and managing the business aspects of Picki Logistics' debts, taxes, registrations, sub-agents' compensation, and other typical obligations requiring business acumen.  All of these skills and initiative, too, must be analyzed with the understanding that Krupicki was required to maintain operations satisfying DOT regulations, which is yet another industry-specific skill. Thus, this factor supports finding Krupicki's independent contractor status under the economic realities test.

e. *Permanency of Relationship*

Krupicki's IC Agreement with EagleOne contained clear terms establishing both parties' rights regarding the ability to end their contractual relationship.  First, both parties could terminate the IC Agreement at anytime for any reason with only one (1) day's notice.  IC Agreement, ¶ 23.  Krupicki was also free to simultaneously contract with other companies, including EagleOne's competitors, and he exercised this right.  IC Agreement, ¶ 10; *see* Krupicki Dep., pp. 14:24-15:4.   Further, Krupicki was not performing services exclusively for EagleOne.  *Id.*; *see* IC Agreement, ¶ 10 (agreeing not to use Krupicki exclusively).   In fact, Krupicki has been procuring deliveries through other competing companies throughout central Arkansas in EagleOne's industry, such as Xpress and Statewide, among others, since leaving EagleOne.  Krupicki Dep., pp. 15:13-16:2.

Courts have found that these exact factors support finding an independent contractor relationship under the FLSA.  *See Molina v. S. Fla. Express Bankserv, Inc.,*

420 F. Supp. 2d 1276, 1287 (M.D. Fla. March 8, 2006) (*citing Express Sixty Minutes*, 161 F.3d at 304). Such a finding is supported by the fact that approximately 71% of the owner-operators that contracted with EagleOne over the past two years have elected to terminate their IC Agreements or have otherwise ceased completing services to EagleOne's customers. Affidavit of Scott Maddox, ¶ 42. Moreover, approximately 33% of those owner-operators' IC Agreements ended within six months of the execution of the agreement. *Id.* Thus, despite Krupicki's extended contract period with EagleOne, the evidence supports finding that an independent contractor status. *See Express Sixty Minutes*, 161 F.3d at 304.

   f.   *Owner-Operators Not Integral To EagleOne's Motor Carrier Business*

   Some courts consider whether the services provided by an individual are "integral tasks of the contracting business." *See e.g. Stagl v. Vadell*, 2011 U.S. Dist. LEXIS 132402, at *8 (D.N.D. Nov. 15, 2011). Notably, "[i]n the context of transport and delivery services, courts have repeatedly found that, while driving and delivery are integral to the business, the drivers are just as likely to be independent contractors as they are to be employees." *Sahinovic v. Consol. Delivery & Logistics, Inc.*, No. C 02-4966 SBA, 2004 U.S. Dist. LEXIS 31197, at *21-*22 (N.D. Cal. Sept. 13, 2004) (citing cases) (finding this factor favored independent contractor status of delivery driver even though putative employer had no business other than coordinating deliveries).

   Here, EagleOne provides logistics consulting, technology, financial and transportation management services to multiple industries. This involves, among other things, coordinating the delivery of products sold by pharmaceutical companies and retailers. To that end, EagleOne marries the needs of its shipper customers with owner-

197835

operators like Krupicki who offer professionally-staffed hauling and delivery capacity—
*i.e.*, owner-operators provide the equipment and labor necessary to professionally, timely, and efficiently carry out the deliveries EagleOne coordinates and arranges.

While the operation of motor vehicles by professional drivers like Krupicki is a part of any motor carrier's business, this is not a "determinative [factor] in the face of more compelling countervailing factors." *FedEx Home Delivery*, 563 F.3d at 502; *cf. Ruiz*, 2012 U.S. Dist. LEXIS 121477, at *38-*40 (Cal. Super. Ct. Feb. 26, 2007) (finding this factor neutral because a delivery driver's services will always be part of the regular business of a delivery company, regardless of whether the driver is an independent contractor or an employee). Therefore, this factor provides little assistance in distinguishing between employees and independent contractors in a delivery context.

Moreover, it is well-settled under federal law that motor carriers may engage the services of independent contractors to perform such driving services without turning those contractors into employees. *See* 49 C.F.R. Part 376; *Am. Trucking Ass'ns v. U.S.*, 344 U.S. 298, 303 (1953) (noting "[c]arriers . . . have increasingly turned to owner-operator truckers to satisfy their need for equipment as their service demands . . . . The use of non-owned equipment by authorized carriers is not illegal."). If courts deemed an employment relationship to exist based on this factor alone, motor carriers "could never hire delivery drivers who *are* independent contractors." *FedEx Home Delivery*, 563 F.3d at 502 (emphasis in original). As such, the fact that Krupicki's delivery services are related to EagleOne's multi-faceted logistics operations does not support his claim that he was treated by EagleOne like an employee.

g. *Other Factors*

i. <u>Tax Deductions Indicative of Independent Contractor Status</u>

Federal courts, including the United States Supreme Court, have long held that owner-operators in the transportation industry are independent contractors for federal employment tax purposes. *See, e.g.*, *United States v. Mutual Trucking Co.*, 141 F.2d 655 (6th Cir. 1944); *Harrison v. Greyvan Lines, Inc.*, 331 U.S. 704 (1947); *United States v. Silk*, 331 U.S. 704 (1947). In *Silk*, when the Supreme Court found in favor of independent contractor status, the Court cited factors the owner-operators in question here clearly meet, including that the drivers in *Silk* owned their own equipment, paid their own expenses, chose their own routes, and were compensated by the number of deliveries or trips made under the terms of written contracts. 331 U.S. 704. In addition, courts regularly find the fact that an alleged employee took tax deductions in the operation of its own business as a factor indicating independent contractor status. *See e.g.*, *CEVA*, 2012 U.S. Dist. LEXIS 114002, at *10 (noting that a plaintiff-driver's corporate entity took tax deductions for expenses incurred in providing delivery services); *Mack v. Talasek*, 2012 U.S. Dist. LEXIS 42485, at *8-*9 (S.D. Tex. March 28, 2012) (noting that the plaintiffs' income tax returns showed that they deducted business-related expenses for transportation, equipment, supplies, insurance, and other costs).

To the extent that Krupicki, individually or through Picki Logistics, Inc., filed tax deductions based on operating, costs, this too may support a finding that Krupicki was an independent contractor. Plaintiff objected to providing any tax information during discovery of this case, and this issue is currently pending before the Court.

ii.  <u>Similar Lease Arrangements Held Lawful</u>

Multiple courts have found or confirmed independent contractor status of owner-operators who procure trucking equipment through leasing arrangements facilitated through a contracting motor carrier.  *See e.g. Ruiz*, 2012 U.S. Dist. LEXIS 112477 (deeming owner-operator to be an independent contractor and not an employee under the FLSA when motor carrier deducted lease payments for motor carrier-facilitated lease from the owner-operator's compensation); *Byers v. Comm'r*, T.C. Memo 2007-331 (U.S.T.C. Nov. 5, 2007) (noting some drivers leased equipment from a company related to the motor carrier, but finding a leaseback arrangement similar to Krupicki and EagleOne's resulted in an independent contractor relationship); *Bonnett's*, 7 F. Supp. 2d 977 (upholding independent contractor status of a truck driver in a FMLA case when the truck driver leased a truck from an affiliate of the motor carrier, stating that "[t]he fact [the truck driver] chose to lease a truck from an affiliate of the motor carrier is of no consequence"); *Hilldrup Transflo & Storack of New Smyrna Beach, Inc. v. Florida Dep't of Labor and Employment Sec.*, 447 So.2d 414 (Fla. App. March 22, 1984) (finding independent contractor status on similar grounds).  Thus, the fact that Krupicki leased a truck through a company arguably affiliated with EagleOne is of no consequence to the economic reality of his work performance under his contract with EagleOne.

h.  *Summary*

In summarizing the factors discussed above, little doubt remains in determining that Krupicki was an independent contractor.  Even as an individual driver with the economic freedoms in his contract with EagleOne, Krupicki would not be considered an employee under the FLSA.  Combining the reality that Krupicki formed a corporate

entity, opened a corporate bank account, contracted with other individuals to operate his equipment on his behalf (and making a profit), and performed the same services for other companies during the same time period as with EagleOne, his being anything other than an independent contractor is undeniable.   In fact, Krupicki classified his own sub-agents as "independent contractors" for Picki Logistics yet claims to be an "employee" of EagleOne despite being in identical positions.   Such hypocrisy cannot survive summary judgment.

Therefore, Krupicki's overtime and retaliation claims fail as a matter of law because he was not an EagleOne employee, and his FLSA claims should be dismissed with prejudice.

### 2.  Even if he was an employee, Krupicki was exempt from overtime under the FLSA.

Krupicki, even if considered as an EagleOne employee, is still not entitled to any overtime compensation.   The FLSA's Motor Carrier Exemption exempts any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service.   29 U.S.C. § 213(b)(1); *see Guyton v. Schwan Food Co.*, 2004 U.S. Dist. LEXIS 4174, at *7 (D. Minn. March 16, 2004) (citing 29 U.S.C. § 213(b)(1)), *aff'd at* 125 Fed. Appx. 84 (8th Cir. 2005).   The Motor Carrier Exemption is applicable where the Secretary of Transportation has the authority to regulate, not where such power is actually exercised.  *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 678 (1947). Thus, where an individual, even if an employee, falls within the parameters of the Motor Carrier Exemption, the employee is exempt from overtime pay requirements established in the FLSA.

In order to qualify for the Motor Carrier Act Exemption, the employee must:

1. Be employed by an employer subject to the jurisdiction of the Secretary of Transportation (i.e., a motor carriers and motor private carriers) [49 U.S.C. § 31502(b)];

2. Not be subject to the Small Vehicle exception to the Motor Carrier Act Exemption [49 U.S.C. § 31132(a)(A)]; and

3. Be engaged in activities of a character directly affecting the safety of operations of motor vehicles in the interstate transportation of passengers or property.

*See* 29 C.F.R. 782.2; *see also* DOL Field Assistance Bulletin No. 2010-2, attached to Defendant's Response to Plaintiff's Motion for Summary Judgment as Exhibit S.

Here, the evidence establishes that EagleOne is unquestionably under the regulatory authority of the Secretary of Transportation. *See* Affidavit of Scott Maddox, ¶ 3.

With respect to the second prong, drivers are a class of workers that are engaged in activities directly affecting the safety of operations of motor vehicles. 29 C.F.R. § 782.2(b)(2); 29 C.F.R. § 783. Therefore, drivers qualify for the Motor Carrier Exemption so long as they are driving a motor vehicle weighing more than 10,000 pounds[15] in interstate or foreign commerce. 29 C.F.R. § 782.2(b)(3). The "interstate

---

[15] Congress passed legislation amending the definition of a "commercial vehicle" to include a vehicle that has a gross vehicle weight of over 10,0001 pounds. *See McCall v. Disabled American Veterans Ernestine Schumann-Heink Missouri Chp. 2, et al.*, Case No. 11-1298-CV-W-ODS, pp. 3-4 (W.D. Mo. July 27, 2012) (discussing in detail the state of the law for the Motor Carrier Exemption), attached to Defendant's Motion for Summary Judgment as Exhibit P. That Act decreed that the overtime provisions contained in the FLSA would apply to a "covered employee," which it defined to include a driver of a motor vehicle "weighing 10,000 pounds or less." *Id.* (*citing* Pub. L. No. 110-244, Title III, § 306 (2008)). Thus, where evidence establishes that a driver operates a vehicle with a gross vehicle weight of *over* 10,001 pounds, summary judgment is appropriate on any overtime claims brought by that driver. *See McCall*, Case No. 11-1298-CV-W-ODS, p. 5 (granting summary judgment to employer on employee's FLSA overtime claims

197835

commerce" requirement is met even where goods in intrastate commerce are viewed in "one leg of an interstate journey." *See* Roberts v. Levine, 921 F.2d 804, 810-14 (8th Cir. 1990); *see also Abel v. S. Shuttle Servs., Inc.*, 631 F.3d 1210, 1215 (11th Cir. 2011) (analyzing multiple cases that "make clear that trips within a single state are made in interstate commerce when they are part of a practical continuity of movement of the goods in interstate commerce"); *see also* 29 C.F.R. § 782.7(b)(1).   Indeed, the Motor Carrier Exemption defines "Drivers" to include "[i]ndividuals whose driving duties are concerned with transportation, some of which is in intrastate commerce and some of which is in interstate or foreign commerce."  29 C.F.R. § 782.3(a).

Krupicki meets the second prong of the Motor Carrier Exemption test.   First, Krupicki operated a vehicle over 10,000 pounds that directly affects the safety of motor vehicles in the interstate transportation of property.   Krupicki Dep., pp. 23:20-24:8, pp. 52:23-53:12; *see* Bush Truck Registrations, Exhibit K; *see also McCall,* Case No. 11-1298-CV-W-ODS, p. 5; *Aira v. Best Nat'l Vending, Inc.*, 2012 U.S. Dist. LEXIS 148534, at *24-*26 (S.D. Fla. October 16, 2012) ("the plaintiff's use of public highways as a distribution route driver in relation to interstate commerce is sufficient to find that his activities affected the safety of operations of motor vehicles in the transportation of interstate commerce property" (citing 29 C.F.R. §782.2(b)(2)).   Notably, Krupicki himself completed a DOT Application and other DOT forms while contracting with EagleOne. *See* DOT Forms, Exhibit H.

Second, Krupicki hauled loads in interstate commerce.   The products delivered by Krupicki, via his own equipment and vehicle, originated from all around the United States.   Maddox Aff., ¶¶ 8-9.   These products were generally staged, sorted by

39

distribution route, and loaded for transportation within hours of arrival to EagleOne's cross-docks.  *Id.* at ¶¶ 9-11.  Thus, even though his truck may have never crossed Arkansas's state line, his transportation services were part of the practical continuity of interstate commerce because his deliveries were "one leg of an interstate journey."  *See Roberts*, 921 F.2d at 814; *see also Abel*, 631 F.3d at 1215; *see, e.g., Aira*, 2012 U.S. Dist. LEXIS 148534 (granting summary judgment based upon the Motor Carrier Exemption).

In sum, even assuming Krupicki was employed by EagleOne, Krupicki's delivery services to EagleOne's customers render him exempt from the payment of overtime under the FLSA's Motor Carrier Exemption.  As such, he is precluded from recovering any alleged unpaid overtime from EagleOne.  Accordingly, his overtime claim must be dismissed with prejudice even if he is able to establish a question of fact regarding his status as an EagleOne employee.

### 3. Even if Krupicki was entitled to overtime compensation, he has failed to show that he is entitled to any unpaid overtime work performed.

Krupicki makes broad claims of overtime compensation, yet he has failed to provide any evidence showing that he actually worked any time over 40 hours in one week.  Further, even if he did, he has failed to establish what amounts, if any, are owed to him.

As discussed, Krupicki performed delivery services on various distribution routes through central Arkansas, and he engaged others to operate his vehicles on his distribution routes on his behalf.  The deliveries were made in a 12-hour window each day, and there was no supervision over Krupicki's (or his sub-agents') personal stops or meal breaks.

197835

Krupicki received a weekly, gross settlement check for the compensation due for deliveries made by himself and his sub-agents, and those settlement checks did not itemize which individual made which deliveries.   *See* Krupicki Settlement Check, attached to Krupicki's Motion for Partial Summary Judgment (Document 26-9) as Exhibit H.   Further, EagleOne did not maintain time records for owner-operators as none of them ever clocked-in or clocked-out.   Based upon information and belief, Krupicki likewise did not maintain time records on behalf of his sub-agents.   Krupicki has failed to produce any evidence to even approximate whether any overtime was worked, if any, or how much beyond Krupicki's own unsubstantiated claims.

Consequently, it is a practical impossibility to calculate what hours he worked, what hours his sub-agents worked, and, thus, whether any overtime compensation would be owed if Krupicki was in fact an EagleOne employee.   Krupicki bears the burden of proving that he is entitled to overtime compensation, first, and, if so, in a proper amount.  *See Smith v. International Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008) ("[t]o establish the existence of a genuine issue of material fact, '[a] plaintiff may not merely point to unsupported self-serving allegations' . . . [but] must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor"). Because of this impossibility, Krupicki's overtime claims fail as a matter of law, and should be dismissed.

## B. <u>EagleOne did not retaliate against Krupicki</u>.

At the outset, EagleOne adamantly re-asserts that Krupicki does not fall under the FLSA's coverage.   For the same reasons discussed above, Krupicki was an independent contractor with EagleOne and not an employee as defined under the

FLSA.   *See* Argument, § IV.A, *supra*.   Thus, his FLSA retaliation claim should be dismissed outright on this fact alone.   *See* 29 U.S.C. § 215(a)(3).   The following argument is made only to respond to Krupicki's allegations that he was EagleOne's employee and to show that, even if he was, his retaliation claims still fails as a matter of law.

The FLSA also contains an anti-retaliation provision prohibiting an employer's ability "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . under or related to this chapter."  29 U.S.C. § 215(a)(3).   To establish a prima facie case of retaliation under the FLSA, Krupicki must establish that: (1) he participated in statutorily protected activity; (2) that EagleOne took an adverse employment action against him; and (3) that there was a causal connection between his statutorily protected activity and the adverse employment action. *See Grey v. City of Oak Grove*, 396 F.3d 1031, 1034-35 (8th Cir. 2005).

The United States Supreme Court has recently held that the FLSA's anti-retaliation provisions are triggered when an employee makes an oral complaint as well as written complaints.   *Kasten v. Saint-Gobain Performance Plastics, Corp.*, 131 S. Ct. 1325, 1335-36 (2011).   However, "[t]o fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection."   *Id.* at 1335 (alterations supplied).

Recently, in *Montgomery v. Havner*, 2012 U.S. App. LEXIS 24224 (8th Cir. 2012), the Eighth Circuit Court of Appeals upheld a District Court's Order granting an employer's summary judgment on an employee's FLSA retaliation claim.  The employee

197835

based her claim on a conversation where she inquired into a ten-minute deduction from her paycheck that ended with the employer agreeing to add it back into her time record. *Id.* at *2-*3.   That Court found that "no reasonable jury" could conclude that the discussion "was a sufficiently clear and detailed FLSA complaint for the [employer] reasonably to understand [that the employee] was alleging an FLSA violation." *Id.* at *6 (alterations supplied) (citing *Kasten*, 131 S. Ct. at 1335).

In *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713 (8th Cir. 2011), the Eighth Circuit found that an employee's FLSA retaliation claim was properly dismissed under Fed. R. Civ. 12 because she failed to allege that she engaged in a statutorily protected activity.  That Court found that the plaintiff-employee's statement that "she believed [her employer's] instructions were a violation of the [FLSA]" because her supervisor told her not to record any overtime hours was an informal complaint not sufficient to constitute "an affirmative complaint that would trigger the anti-retaliation provision of the FLSA. . . ." *Id.* at 716.  Instead, that Court found that the employee engaged in nothing more than simple insubordination. *Id.* at 716-17.

In order to establish a causal connection for retaliation, an employee "must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not engaged in the protected activity." *Shelton v. Techpak America, Inc.*, 2011 U.S. Dist. LEXIS 49460, at *18 (E.D. Tenn. May 6, 2011) (quoting *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999)). Notably, "temporal proximity alone is insufficient to establish causation. *Id.*

Courts apply the same *McDonnell Douglas* burden-shifting analysis under Title VII to FLSA claims.  *Grey*, 396 F.3d at 1034.  If an alleged employee sufficiently

satisfies the elements of his or her prima facie case, the burden then shifts to the employer to produce a legitimate, non-retaliatory reason for the adverse action. *Id.* at 1035. Once the employer proffers such a reason, the burden of production then shifts back to the employee to show the employer's proffered reason is a mere pretext for the retaliatory conduct. *Id.* Notably, the overall burden of persuasion for an FLSA retaliation claim stays on the alleged employee at all times. *See Conner v. Schnuck Mkts.*, 121 F.3d 1390, 1396 (10th Cir. 1997).

In this case, Krupicki believed his settlement check contained a computation error, so he complained about the gross payment to his Terminal Manager, Brad Schultz. Krupicki Dep., p. 76:13-20; p. 78:2-12. According to Krupicki, Schultz looked into the matter and followed-up with Krupicki shortly thereafter. Krupicki Dep., p. 76:15-20. It turned out that Krupicki was correct, and EagleOne informed him that he would be paid for those deliveries based on the regular piece-rate payment system. Consequently, Krupicki received an adjusted weekly settlement check for a total of $286.00 based on the number of packages he delivered that week. Krupicki Dep., pp. 76:24-77:3; p. 78:2-12.

Krupicki's effort to notify his Terminal Manager that his settlement check contained an accounting error was not "a sufficiently clear and detailed FLSA complaint for the [employer] reasonably to understand [that the employee] was alleging an FLSA violation." *Havner*, 2012 U.S. App. LEXIS 24224 at *6. Krupicki's discussion with Schultz was not related to any of EagleOne's payment practices or policies or any other complaint about a right under the FLSA. *See Ritchie*, 630 F.3d at 716-17. Rather, he was merely pointing out that his check was improperly tallied, more akin to a

simple scrivener's error.[16]   Regardless, EagleOne did not object to Krupicki's complaint and agreed to correct his settlement check.   Krupicki's allegations nearly mirror those of the employee in *Havner* where the employer was granted summary judgment on the FLSA retaliation claim.   *See* 2012 U.S. App. LEXIS 24224, at *2-*3.

In his testimony, Krupicki stated that both he and other owner-operators "complained regularly" about their revenues.   Krupicki Dep., 79:11-15.   In fact, Krupicki stated that he made complaints about EagleOne's changing some distribution routes' payment structure from dedicated pay to piece-rate pay.   Krupicki Dep., 79:11-15. However, neither Krupicki nor any others he could identify were terminated for making such prior complaints.   *See* Krupicki Dep., pp. 82:21-85:86:23.   To the contrary, at least two such owner-operators that allegedly made complaints about compensation similar to Krupicki's—Thomas Mulder and "Wynell"—still work for EagleOne.   Krupicki Dep., p. 85:13-20.

Krupicki has established no evidence to show that he was retaliated against by his contract being terminated, save for temporal proximity alone.   *See Shelton*, 2011 U.S. Dist. LEXIS 49460, at *18, (finding that temporal proximity alone is insufficient to show causation).   Thus, Krupicki has failed to satisfy *his* burden of persuasion to show that he was unlawfully retaliated against by EagleOne.   *See Schnuck Mkts.*, 121 F.3d at 1396.

---

[16]   Despite his Complaint's allegation, Krupicki's deposition testimony failed to identify any specific complaints he made to EagleOne about his weekly settlement checks not being minimum wage.   To the contrary, he stated that "we complained regularly" about revenues, but has not identified any other alleged retaliatory conduct by EagleOne.   *See* Krupicki Dep., p. 79:11-15.

In addition to the dispositive fact that Krupicki was an independent contract, Krupicki has failed to establish a prima facie case of retaliation under the FLSA.  Thus, his FLSA retaliation claim, too, must be dismissed by law.

**C.** **The Arkansas Deceptive Trade Practices Act is inapplicable to Krupicki's claim and, even if it was, Krupicki has failed to establish any question of fact as to whether EagleOne is liable under its terms.**

Krupicki also asserts claims against EagleOne under the ADTPA, Ark. Code Ann. §§ 4-88-101, *et seq.*  Specifically, Krupicki alleges that EagleOne "deducted an excessive amount of money from Krupicki's paycheck for the [Bush] Truck lease payments" in violation of the ADTPA.  Complaint at ¶ 75.  Additionally, Krupicki alleges that EagleOne engaged in deceptive trade practices under the ADTPA when it "withheld $4,800 from Krupicki's pay ostensibly to pay for the sales tax owed on the Truck, but instead kept the money to itself."  Complaint at ¶ 76.  Contrary to Krupicki's claims, EagleOne did not engage in deceptive trade practices under the ADTPA with respect to any deduction withheld from Krupicki's settlement funds.  As discussed below, there are no genuine issues of material fact as to Krupicki's ADTPA claims and, as such, EagleOne is entitled to summary judgment.

**Krupicki's Lease Agreement with Bush**

In June 2006, Krupicki, as discussed, entered into an agreement with Bush Leasing for the lease of the Bush Truck.  *See* Bush Lease Agreement, Exhibit E. EagleOne did not sign the Lease Agreement between Krupicki and Bush Leasing.  *See id.*  Under the terms of the Bush Lease Agreement, Krupicki agreed to make periodic rent payments to Bush Leasing for use of the Truck plus all applicable license and registration fees.  *Id.* at ¶¶ 3, 11.  Krupicki also agreed to pay all taxes associated with

the Bush Truck, including sales and use tax.  *Id.* at ¶ 13.  In the event Bush Leasing paid any of the taxes associated with the truck, Krupicki agreed to reimburse Bush Leasing for the amount of taxes paid in addition to an administrative fee.  *Id.*  Under his their Agreement, Bush Leasing agreed to provide Krupicki with written notice of any taxes paid and its intent to seek reimbursement.  *Id.*

The independent contractors, who chose to lease trucks through Bush Leasing, such as Krupicki, authorized EagleOne to withhold the weekly rental payments owed to Bush from their settlement checks.  *See* ICS Agreement, Exhibit C, ¶ 4.  The terms and conditions of the individual lease agreements varied from contractor to contractor based on their negotiations with Bush Leasing.  *See* Maddox Aff., ¶ 33.

Bush Leasing issued monthly statements that listed the amount owed by each independent contractor.  Maddox, Aff. ¶ 30; *see also* Program Agreement, ¶ 3, Exhibit Q.  EagleOne forwarded amounts deduceted from owner-operators' settlement checks to Bush Leasing.  Maddox Aff., ¶¶ 31-32.  As Krupicki has not provided any evidence to show that EagleOne engaged in any deceptive behavior, it cannot be liable for alleged errors in Bush's accounting, if any.  *See Little Rock Elec. Contrs. V. Entergy Corp.*, 79 Ark. App. 337, 887 S.W.3d 842 (Ark. App. October 3, 2002).

Krupicki's ADTPA claim concerns deductions from his settlement proceeds.  The ADTPA is a consumer protection law aimed at preventing individuals and businesses from engaging deceptive and misleading trade practices.   The ADTPA makes "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade. . . ." unlawful.  Ark. Code Ann. § 4-88-107(a)(10).  A private cause of action under the ADTPA is available to "any person" who suffers actual damage or

injury as a result of a violation of the act.   *See* Ark. Code Ann. § 4-88-113(f).   The elements of an ADTPA claim are "(1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such an act." *Forever Green Athletic Fields, Inc. v. Lasiter Construction, Inc.*, 2011 Ark. App. 347, *17 (Ark. App. May 11, 2011).   "A private cause of action does not arise absent a showing of both violation and resultant damages."   *Id.* at *18.

In determining whether a particular contract or provision is unconscionable, Arkansas courts consider (1) whether there is a gross inequality of bargaining power between the parties and (2) whether the complaining party knew and comprehended the provision in question.   *State ex rel. Bryant v. R & A Inv. Co.*, 336 Ark. 289, 296, 985 S.W.2d 299, 302 (1999) (citing *Arkansas Nat'l Life Ins. Co. v. Durbin*, 3 Ark. App. 170, 174-175, 623 S.W.2d 548, 551 (1981)).   Further, a plaintiff's "self-serving statements regarding a party's state of mind or subjective beliefs are no more than conclusions and are not, therefore, competent summary judgment evidence."   *Little Rock Elec. Contrs.*, 79 Ark. App. at 342.

In the instant case, Krupicki offers no evidence supporting the elements necessary to establish a claim against EagleOne under the ADTPA.   It is important to consider that the ADTPA is a *consumer* protection statute.   *See Bryant*, 336 Ark. at 295 (discussing legislative intent of General Assembly in enacting the ADTPA).   Krupicki incorporated and operated his own business, Picki Logistics, and he has worked in the commercial delivery industry for nearly a decade.   *See* Krupicki Dep., pp. 11-12; p. 32:25; p. 33:1-12.   Thus, as a small-business owner utilizing the services of others on

his behalf, Krupicki was not a disadvantaged consumer in need of protection under the ADTPA at any time relevant to this lawsuit.  Thus, his ADTPA claim is without merit.

To prevail under the ADTPA, Krupicki must establish that EagleOne, even if a party to the Bush Lease Agreement, committed a deceptive and unconscionable trade practice.  *Little Rock Elec. Contrs.*, 79 Ark. App. at 342, 845.  Krupicki cannot meet his burden of proof as to this element.   Krupicki admitted at his deposition that he purchased the truck from Bush, but then makes the unsubstantiated allegation that he "made all payments to EagleOne."   Krupicki Dep., p. 26:16-17. Krupicki offers no evidence, other than his own self-serving speculation, to support his allegation that EagleOne wrongly withheld excessive funds for its own benefit.  *See id.* at 342, 845-46 (self-serving statements of belief not competent evidence for summary judgment purposes); *see also* Complaint, Document 1, ¶¶ 73-77.   Outside of Krupicki's self-serving, conclusory allegations contained in his Complaint, there is no evidence to support his claim against EagleOne.

Krupicki's self-serving statements are insufficient to prove that EagleOne acted in a deceptive and unconscionable manner and do not create genuine issues of material fact sufficient to avoid summary judgment.  *Little Rock Elec. Contrs.*, 79 Ark. App. at 845-846 ("[Plaintiff]'s belief's, standing alone, do not create genuine issues of material fact sufficient to avoid summary judgment").   Krupicki may bring an action against Bush Leasing for any alleged unfair or deceptive withholding, if any.   As Krupicki has established no evidence of any deceptive or unfair trade practice by EagleOne, his ADTPA claim should be dismissed as against EagleOne.

197835

The substance of Krupicki's ADTPA claim is similarly flawed. Specifically, Krupicki alleges that EagleOne withheld funds from his settlement checks to pay taxes on the Bush Truck, and that such funds must have been misappropriated because he had to pay additional sales tax upon final purchase of the truck from Bush Leasing. *See* Krupicki Dep., pp. 70-73. However, under his Bush Lease Agreement, Krupicki agreed to pay all taxes associated with the Bush Truck, including sales and use tax. Bush Lease Agreement, ¶ 13, Exhibit E. If Bush paid any of the taxes associated with the truck, Krupicki agreed to reimburse Bush for the amount of taxes paid in addition to an administrative fee. *Id.* The Bush Lease Agreement required that Bush provide Krupicki with written notice of the taxes paid and its intent to seek reimbursement. *Id.* Based on Krupicki's own deposition testimony, this is exactly what happened. *See* Krupicki Dep., pp. 70-75.

At his deposition, Krupicki further testified that, after purchasing the Bush Truck, he received a letter from Bush Leasing stating that he owed unpaid sales tax on the Bush Truck and that $100.00 would be deducted from his settlement check until Bush Leasing was reimbursed in full. Krupicki Dep., p. 72. Krupicki reiterates this by saying, "[a]s far as I know, Bush paid the sales tax and then charged me back for it." Krupicki Dep., p. 70. Krupicki's statements comport with the terms of his agreement with Bush Leasing and further bolster the absence of liability as to EagleOne. *See* Bush Lease Agreement, ¶ 13.

Krupicki claims that he ultimately paid sales tax twice, which he alleges is unlawful, because he was required to pay additional sales tax on the buyout amount at

197835

the time of purchase.[17]   Krupicki Dep., p. 71.   However, Krupicki fails to explain how EagleOne is responsible for anything having to do with the taxes owed on the Bush Truck.    There is absolutely no evidence whatsoever establishing that EagleOne committed a deceptive or unconscionable trade practice with respect to the taxes paid in connection with the lease and sale of the truck.   There is nothing unconscionable about the agreements between EagleOne and Krupicki.   Moreover, EagleOne was not a party to the Lease Agreement and, therefore, a determination as to whether it is unconscionable is irrelevant as to EagleOne.

Even if the parties' contractual relationship alone does not merit dismissal, summary judgment should be granted nonetheless because Krupicki cannot establish that EagleOne engaged in a deceptive and unconscionable trade practice—a necessary element of an ADTPA claim.   Krupicki's personal beliefs and theories, standing alone, cannot create a genuine issue of material fact sufficient to avoid summary judgment.   As such, his ADTPA claim asserted against EagleOne should be dismissed with prejudice.

### D. __Krupicki Cannot Establish an Unjust Enrichment Claim Against EagleOne.__

Finally, Krupicki asserts an equitable claim against EagleOne for unjust enrichment.   Krupicki specifically alleges that EagleOne was unjustly enriched by, among other things, illegally and deceptively misclassifying him as an independent contractor.   Complaint, Document 1, ¶¶ 78-81.   First, as discussed above, Krupicki was an independent contractor and, therefore, not misclassified under the FLSA.   *See* Argument, § IV., *supra*. Further, it is undisputed that the parties voluntarily entered into

---

[17] Krupicki very well may have paid taxes on both the rental payments and the buyout amount of the truck under Arkansas law.   *See* Ark. Code Ann. § 26-63-304.   It is also important to note that the record contains no proof evidencing the amount of taxes allegedly to have been paid.

an agreement for contracted services to be performed by Krupicki with terms governing the contractual relationship. *See generally* IC Agreement, Exhibit B. In Arkansas, Krupicki cannot maintain a claim of unjust enrichment if there is a written contract, as there is in this case. *See, e.g., Servewell Plumbing, LLC v. Summit Constrs., Inc.*, 362 Ark. 598, 612 (2005) (holding that "the concept of unjust enrichment has no application when an express written contract exists" and upholding the trial court's dismissal of a plaintiff's unjust enrichment claim where enforceable contract existed). As such, Krupicki's theory of unjust enrichment is improperly asserted and must be dismissed as a matter of law.

## V.  CONCLUSION

As shown above, there are no remaining issues of material fact and each of Krupicki's claims fail as a matter of law. While the legal technicalities are important to this analysis, a broad view of Krupicki's operations with EagleOne evidence that, in reality, he was in business for himself. That fact is the core of being a true independent contractor. Krupicki has offered no evidence beyond his own self-serving, conclusory terms as support for his claims against EagleOne. Instead, Krupicki's testimony about his business conflicts with his claims under the FLSA, and summary judgment is the appropriate medium in which to dismiss a claim that, by law, fails.

197835

Respectfully submitted,

Donna S. Galchus (Bar No. 80049)
Missy M. Duke (Bar No. 99167)
Gregory J. Northen (Bar No. 2011181)
CROSS, GUNTER, WITHERSPOON &
  GALCHUS, P.C.
500 President Clinton Ave., Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 371-9999
Facsimile: (501) 371-0035
Email: dgalchus@cgwg.com
Email: mduke@cgwg.com
Email: gnorthen@cgwg.com

*/s/ Donna Galchus*
By:  Donna S. Galchus

**ATTORNEYS FOR DEFENDANT
EAGLEONE, INC.**

## CERTIFICATE OF SERVICE

    I, Donna S. Galchus, hereby certify that on this 21st day of December 2012, a copy of the foregoing pleading was served via email and U.S. Mail to the following attorneys of record:

**John T. Holleman, IV**
**Maryna O. Jackson**
Holleman and Associates, P.A.
1008 W. Second Street
Little Rock, Arkansas 72201

*/s/ Donna Galchus*
   Donna S. Galchus

197835